**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

$92,285.00 in United States Currency,

Defendant.

3:19-CV-356-LRH-CLB

**Default Judgment of Forfeiture and Final Judgment of Forfeiture**

## I. Facts of the Case

On January 10, 2019 at approximately 11:30 A.M., William Morse was driving a 2018 silver Toyota Camry bearing a Colorado license plate westbound on Interstate 80 in Washoe County, Nevada. He was heading west, away from Reno, Nevada. Morse was the sole occupant of the Camry.

Also on January 10, 2019 at approximately 11:30 A.M., Virgil Reed Parker was driving a 2013 white Nissan Altima bearing a Kansas license plate directly behind the Camry. Parker was the sole occupant of the Altima.

An officer of the Washoe County Sheriff's Office (WCSO) observed the Altima following the Camry at a distance of one-and-one-half car lengths and, then, the Camry following a semi-truck at a distance of one-and-one-half car lengths.

WCSO officers initiated simultaneous, separated traffic stops of the Altima and the Camry (approximately 300 yards apart) for following too closely in violation of Nevada law.

A WCSO officer approached the Camry and identified Morse through his Missouri driver's license. Morse told the officer that the vehicle was a rental, and the officer observed

a rental agreement on the front passenger seat. The officer advised Morse of the reason for the stop.

The WCSO officer engaged Morse in conversation. Morse identified his destination as "Clear Oak Lake, California." Morse initially used the pronoun "we" before changing to the pronoun "me" to describe who was traveling there. After further inquiry by the officer, Morse acknowledged that he knew the driver of the Altima. The officer advised another WCSO officer, who was conducting the traffic stop of the Altima, that the drivers knew one another.

While completing a wants-and-warrants check and a warning citation, the WCSO officer further engaged Morse in conversation. Morse communicated the following: (a) Morse and the other driver were on the way to "Clear Lake Oak" to see Morse's ill friend; (b) the other driver, identified as Parker and a "good friend," was not acquainted with the ill friend but was helping Morse drive from the Kansas City area; (c) they had left the Kansas City area thirty-eight hours ago; (d) they had rented the Camry because the Altima was having transmission problems; and (e) they planned to stay in California for a day or two before driving back home.

The WCSO officer learned from Morse and the rental agreement that Parker was the renter of the Camry. The officer communicated that information to the other WCSO officer, who was conducting the traffic stop of the Altima.

The WCSO officer explained his role as an interdiction officer to Morse. In response, Morse stated that the Camry contained no contraband and offered that the officer could search the vehicle.

The WCSO officer deployed his on-scene certified, reliable canine—trained to detect the odor of illegal drugs. The canine alerted to the presence of the odor of illegal drugs coming from the Camry.

Based on the positive alert, the WCSO officer conducted a search of the vehicle. The search uncovered debris of suspected marijuana under the front passenger seat and in the middle console.

Following the search, the WSOC officer asked Morse how well he knew Parker. Morse answered: "Not that well." Morse stated that he really did not know what Parker did for a living other than to buy and sell certain hardware items online. Morse also told investigators that he had only known Parker for four or five years.

Meanwhile, as noted above, the other WCSO officer had been conducting a traffic stop of the Altima.

Shortly after identifying Parker as the driver of the Altima through Parker's Missouri driver's license, that WCSO officer asked Parker whether he was traveling with anyone else, to which Parker replied: "No." Morse had disclosed to the other officer that he (Morse) and Parker knew one another, which, as noted, the other officer had communicated via radio to the officer conducting Parker's traffic stop.

The WCSO officer engaged Parker in conversation.

Parker stated that the Nissan belonged to a friend. Investigators would later learn that the vehicle was registered to Crystal Whittiker.

Parker further stated that the reason for his trip was to gamble in Reno and that his plan was to remain in Reno for three days before driving back home. Parker commented that he had "never been to Reno." At the time of the stop, Parker was driving westbound, in the direction away from Reno. Parker stated that he was just taking a drive to see the scenery before checking into a hotel back in Reno. Parker made no mention of a travel companion, a second, rental vehicle, visiting anyone in California, or staying in California.

The WCSO officer then learned from his fellow officer that Parker was the renter of the Camry and that according to Morse the pair was headed to California.

The WCSO officer confronted Parker with that information and revisited the question of whether Parker was traveling alone. Parker then admitted that he was acquainted and was traveling with Morse and stated that he (Parker) had rented the Camry. According to Parker, the Altima was having transmission problems and that at the time of the traffic stop he was test driving it. Parker also said that Morse was traveling to meet someone. Parker was unable to identify the person.

The WCSO officer asked Parker whether there were any illegal drugs in his vehicle. Parker replied "no." The officer then asked Parker whether there were any large amounts of currency in his vehicle. Parker hesitated and, then, answered: "No." When the officer asked him whether he was sure, Parker again said: "No."

The WCSO officer deployed his on-scene certified, reliable canine—trained to detect the odor of illegal drugs. The canine was a different canine than the one deployed in the vicinity of the Camry. The canine alerted to the presence of the odor of illegal drugs coming from the Altima.

Based on the positive alert and the inconsistencies and changes in Parker's story, the WCSO officer communicated to Parker that he (the officer) would be searching the Altima. At that juncture, Parker stated that there was currency in the vehicle. After further inquiry by the officer and hesitation by Parker, Parker said: (a) there was approximately $50,000 in the vehicle; (b) the currency was for gambling; and (c) Parker was not involved with anything else, such as "drugs, weapons."

A search of the vehicle uncovered: (a) a paper shopping bag with a plastic-bag insert containing stacks of United States currency, bundled with rubber bands; (b) air fresheners; and (c) Ozium odor-eliminating spray. One of the bundles of rubber-banded currency found in the double bag was further packaged in a brown paper bag. That bundle had a note on it specifying "7.3," which Parker later told investigators meant that it was $7,300. The other bundles had no such notes, and Parker later communicated to investigators that they were bundled into $5,000 stacks. It is common for individuals transporting currency in the drugs trade to separately label, earmark, and/or package the portion of the currency that represents their transport payment.

The WCSO officer placed the double bag of United States currency along the roadside. Another WCSO officer, who had not seen where his fellow officer had placed the bag, deployed his certified, reliable canine—trained to detect the odor of illegal drugs. The canine was a different canine than each of the respective canines that had been deployed in

///

the vicinities of the Camry and the Altima. The canine alerted to the presence of the odor of illegal drugs coming from the bag of currency.

After finding the United States currency, a WCSO officer engaged in further conversation with Morse. Morse denied knowledge and ownership of the currency but suggested that it belonged to Parker. Morse further elaborated about his and Parker's trip, stating: (a) they had left from Kansas City, Missouri two days earlier; (b) they had traveled consistently from Missouri to Nevada, alternating driving and stopping only at rest stops and for food and gasoline; and (c) they had rented the Camry in Sparks, Nevada about an hour and a half earlier.

On January 10, 2019 at approximately 11:58 A.M., a WCSO officer contacted a DEA agent and briefed the agent on the details of the traffic stops. The agent responded to the scene and engaged Parker in conversation.

The DEA agent asked Parker about the United States currency. Parker stated that the currency totaled approximately $57,000. When Parker had initially admitted knowledge of the currency to a WCSO officer, Parker estimated its value at approximately $50,000. A later bank count would determine that the currency totaled $92,285.

The DEA agent asked Parker about the source of the United States currency. Parker stated that it was from a $50,000 equity line of credit on his home that he had obtained approximately two years earlier. Parker elaborated that two days after the funds had been deposited into his bank account he had withdrawn the currency and placed it in a safe at home.

The DEA agent asked Parker why he kept such large amounts of cash at home and on hand. Parker stated: (a) he did so for convenience, explaining that banks were not always responsive to his needs as a gambler; (b) he did not trust banks; and (c) he did so for tax reasons, commenting that "the government gets enough of my money." Parker did not explain why carrying large sums of currency would better, more safely serve his needs as a gambler than accessing the funds electronically via an ATM machine, whether at a home bank or in or near a casino, or carrying a certified monetary instrument, like a certified

check. After further inquiry by the agent, Parker stated that he did maintain a bank account and debit card with Bank Liberty in Kansas City.

The DEA agent asked Parker about his living expenses and annual income. Parker estimated that he earned approximately $75,000 per year but netted a total of $30,000 per year. Parker stated that he was self-employed as a commercial furniture cleaner, under the name of Virgil Parker Enterprises, and attracted clients solely by "word of mouth." The agent was unable to find any listing for Parker's business online. Parker estimated his total annual expenses to be $56,700. That would have resulted in an annual net income of $18,300, which differed from Parker's earlier reported net income of approximately $30,000.

The DEA agent asked Parker to explain why the canines alerted to the United States currency. Parker first stated that the currency might have been tainted before he had received it. After the agent reminded Parker that Parker had stated that the currency had been in a home safe for two years, Parker said that he had removed and replaced money in the safe over that time.

The DEA agent asked Parker to identify the most-predominant denomination among the United States currency. Parker stated that it was primarily $100 bills. A later bank count determined that the $92,285 in currency was composed of the following: (a) $27,600 in $100 bills (276 bills); (b) $6,400 in $50 bills (128 bills); (c) $56,800 in $20 bills (2,840 bills); (d) $990 in $10 bills (99 bills); (e) $490 in $5 bills (98 bills); and (f) $5 in $1 bills (5 bills).

The DEA agent asked Parker to provide further details about his trip. Parker stated that he and Morse had been acquainted for over twenty years and that Parker had invited Morse to travel with him to Reno to gamble. Parker stated that he and Morse had left Kansas City the day before. In Morse's statements to investigators, he had stated that he and Parker had left two days before and made no mention of plans to gamble, in Reno or elsewhere, or stay in Nevada. Morse had also told investigators initially that he and Parker

///

were "good friends" but, then, that he did not know Parker very well and that they had only known each other for four or five years.

The DEA agent asked Parker to explain why he and Morse were driving west, away from Reno, at the time of the traffic stop. Parker stated that due to transmission problems with the Altima he had been test driving the Altima, with Morse following him in case he broke down so that Parker would have a ride back to Reno. At the time of the traffic stop, Parker, who was driving the Altima, was following Morse, who was driving the Camry, not the other way around. In Morse's statements to investigators, he had mentioned a mechanical issue with the Altima but had maintained that the Camry was rented in case of a break down on the way to California; Morse never mentioned a test drive or any plans to visit or return to Reno for any reason.

The DEA agent asked Parker why he had initially lied about knowing Morse and traveling with Morse. Parker stated that he and Morse were in a romantic relationship and that he had not wanted his family to find out about it. The agent inquired further about why Parker's mere communication to investigators that he knew and was traveling with Morse would have alerted Parker's family to the existence of such as relationship. Parker stated that he did not know.

The DEA agent asked Parker about Morse's earlier statement that at the time of the traffic stop they were heading to California to visit Morse's ill friend. Parker said that he had not intended to accompany Morse to California but that he had not wanted Morse to know. Parker did not elaborate about why he would have lied to Morse about joining him in California.

The DEA agent asked Parker about his lodging plans while in Reno. Parker said that he and Morse planned to stay at Harrah's. When the agent inquired further about whether Parker and Morse had a reservation at Harrah's, Parker responded that they did not but that he had never had a problem booking a room at Harrah's in the past. As noted, Parker had told a WCSO officer earlier that he had never been to Reno.

///

The DEA agent asked Parker to identify the owner of the Altima. Parker said that the car belonged to a friend named Crystal who had lent him the vehicle. The agent then asked for Whittiker's phone number so that he could verify Parker's story. At that point, Parker stated that Crystal did not know that he had driven the vehicle so far and that finding out would upset her. Parker next stated that he had borrowed the car not from Crystal but from one of her friends.

At the conclusion of the traffic stop, the DEA agent seized the United States currency, and a WCSO officer issued Parker a warning citation for following too closely.

The $92,285.00 in United States currency is the entirety of the defendant currency.

**II. PROCEDURE**

On June 25, 2019, the United States filed a verified Complaint for Forfeiture in Rem, ECF No. 1, alleging the $92,285 (defendant property):

a. is all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

b. is all proceeds traceable to all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

c. is all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

///

///

On August 16, 2019, the Court entered an Order for Summons and Warrant of Arrest in Rem for the Property and Notice, ECF No. 3, and the Clerk issued the Summons and Warrant of Arrest in Rem, ECF No. 4.

Pursuant to the Order, ECF No. 3, the following documents were served on the defendant property and all persons or entities who may claim an interest in the defendant property: the Complaint, ECF No. 1, the Order, ECF No. 3, the Summons and Warrant, ECF No. 4, and the Notice of Complaint for Forfeiture. Notice was published according to law.

Pursuant to Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Fed. R. Civ. P. Supp. Rule) G(5), all persons interested in the defendant property were required to: (1) file a verified claim, setting forth the person's or its interest in the property, that (a) identified the specific property claimed, (b) identified the claimant and stated the claimant's interest in the property, and (c) was signed by the claimant under penalty of perjury pursuant to 28 U.S.C. § 1746; (2) file the verified claim with the Clerk of the above-entitled Court no later than 35 days after the notice was sent or, if direct notice was not sent, no later than 60 days after the first day of publication on the official internet government forfeiture site, www.forfeiture.gov; (3) file an answer to the Complaint for Forfeiture in Rem or a motion under Rule 12 with the Clerk of the Court, Bruce R. Thompson U.S. Courthouse and Federal Building, 400 South Virginia Street, 3rd Floor, Reno, Nevada 89501, no later than 21 days after filing the verified claim; and (4) serve a copy of the verified claim and the answer at the time of each filing on James A. Blum, Assistant United States Attorney, 501 Las Vegas Boulevard South, Suite 1100, Las Vegas, Nevada 89101. Complaint, ECF No. 1; Order for Summons and Warrant, ECF No. 3; Summons and Warrant, ECF No. 4.

On August 27, 2019, the United States Marshals Service served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for

///

Forfeiture and Arrest by executing them on the defendant property. Notice of Filing Take into Custody, ECF No. 5.

Public notice of the forfeiture action and arrest was given to all persons and entities by publication via the official internet government forfeiture site, www.forfeiture.gov, from August 23, 2019, through September 21, 2019. Notice of Filing Proof of Publication, ECF No. 6.

On August 27, 2019, the United States Attorney's Office served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on Paul Morrison Esq., Morrison & Dersch, Counsel for Virgil Reed Parker, Jr., by certified return receipt mail and regular mail. Notice of Filing Service of Process, ECF No. 7-1, p. 3-27, 29-31, 41.

On August 27, 2019, the United States Attorney's Office served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on Virgil Reed Parker, Jr., by certified return receipt mail and regular mail. Notice of Filing Service of Process, ECF No. 7-1, p. 3-27, 32-34, 41.

On August 27, 2019, the United States Attorney's Office served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on Crystal Marie Whittaker by certified return receipt mail and regular mail. Notice of Filing Service of Process, ECF No. 7-1, p. 3-27, 35-37, 42.

On August 27, 2019, the United States Attorney's Office served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on Demetrius Jose Salinas by certified return receipt mail and regular mail. Notice of Filing Service of Process, ECF No. 7-1, p. 3-27, 38-40, 42.

///

On October 25, 2019, the United States filed a Settlement Agreement for Entry of Judgment of Forfeiture as to Virgil Parker and Order, regarding the $92,285. Claimant waived, among other things, service of process. Settlement Agreement, ECF No. 8.

On October 29, 2019, the Court entered the Order granting the Settlement Agreement for Entry of Judgment of Forfeiture as to Virgil Parker and Order. Order Granting Settlement Agreement, ECF No. 9.

No person or entity has filed a claim, answer, or responsive pleading within the time permitted by 18 U.S.C. § 983(a)(4) and Fed. R. Civ. P. Supp. Rule G(4) and (5).

Virgil Reed Parker, Jr., is not in the military service within the purview of the Servicemen's Civil Relief Act of 2003. Exhibit 1.

Crystal Marie Whittaker is not in the military service within the purview of the Servicemen's Civil Relief Act of 2003. Exhibit 2.

Demetrius Jose Salinas is not in the military service within the purview of the Servicemen's Civil Relief Act of 2003. Exhibit 3.

Virgil Reed Parker, Jr., is neither a minor nor an incompetent person.

Crystal Marie Whittaker is neither a minor nor an incompetent person.

Demetrius Jose Salinas is neither a minor nor an incompetent person.

On February 5, 2020, the United States filed a Motion for Entry of Clerk's Default against the $92,285, Crystal Marie Whittaker, Demetrius Jose Salinas, and all persons or entities who may claim an interest in the defendant property in the above-entitled action. Motion for Entry of Clerk's Default, ECF No. 10.

On February 6, 2020, the Clerk of the Court entered a Default against the $92,285, Crystal Marie Whittaker, Demetrius Jose Salinas, and all persons or entities who may claim an interest in the defendant property in the above-entitled action. Entry of Clerk's Default, ECF No. 11.

///

///

///

## III. The Requirements for Default were met.

### A. Legal Standard

Civil forfeiture cases have five requirements that must be fulfilled to complete a default: (1) the judgment sought does not differ in kind from, or exceed in amount, what is demanded in the pleadings pursuant to Fed. R. Civ. P. 54(c); (2) the Clerk of the Court has entered default for a sum certain pursuant to Fed. R. Civ. P. 55(b)(1); (3) publication and personal service were completed pursuant to Fed. R. Civ. P. Supp. Rule G(4); (4) the complaint is legally sufficient to support a reasonable belief that the government will be able to meet its burden of proof pursuant to Fed. R. Civ. P. Supp. Rule G(2), *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392 (9th Cir. 1988); and (5) no person has filed a claim, or the claim(s) have been resolved under 18 U.S.C. § 983(a)(4)(A) or Fed. R. Civ. P. Supp. Rule G(5).

Civil cases that do not directly address forfeiture have seven factors that the Court must consider before entry of default: (1) the substantive merit of the plaintiff's claims; (2) the sufficiency of the complaint; (3) the amount of money at stake; (4) the possibility of prejudice to the plaintiff if relief is denied; (5) the possibility of disputes to any material facts in the case; (6) whether default resulted from excusable neglect; and (7) the public policy favoring resolution of cases on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986); *SATA GmbH & Co. KG v. USA Italco Int'l Ltd.*, No. 3:18-CV-00351-MMD-WGC, 2019 WL 4601513, at *3 (D. Nev. Sept. 20, 2019); *Covenant Care California, LLC v. Shirk*, No. 217CV00956JADVCF, 2018 WL 3429669, at *1 (D. Nev. July 16, 2018).

For purposes of a default judgment, the well-pled allegations of the complaint are taken as true. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 918 (9th Cir. 1987). Furthermore, upon default, the defendant's liability is conclusively established and the factual allegations in the complaint, except those relating to damages, are accepted as true. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). The power to grant or deny relief upon an application for default judgment is within the discretion of the Court. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

**B. The Forfeiture Requirements for Default Were Met.**

a. Judgment Sought

Pursuant to Fed. R. Civ. P. 54(c) and 55(b), the judgment by default does not "differ in kind from, or exceed [the] amount" of relief listed in the Complaint for forfeiture

b. Default and Entry of Default

As shown above, the United States requested entry of Clerk's Default against the $92,285, Crystal Marie Whittaker, Demetrius Jose Salinas, and all persons or entities who may claim an interest in the defendant property in the above-entitled action. ECF No. 10. The Clerk entered the Default as requested. ECF No. 11.

c. Notice

Pursuant to Fed. R. Civ. P. Supp. Rule G(4)(a)(iv)(C), the United States published notice via the official internet government forfeiture site, www.forfeiture.gov, for thirty consecutive days. ECF No. 6. Pursuant to Fed. R. Civ. P. Supp. Rule G(4)(b), the United States served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on all known potential claimants. Notice of Filing Service of Process-Mailing, ECF No. 7.

d. Legal Sufficiency of the Complaint

The Complaint filed in this action was verified. The Court has subject matter jurisdiction, in rem jurisdiction over the defendant property, and venue. The Complaint described the property with reasonable particularity. The Complaint states where the seizure of the defendant property occurred and its current location. The Complaint identifies the statute under which the forfeiture action is brought. The Complaint alleges sufficiently detailed facts to support a reasonable belief that the United States will be able to meet its burden of proof at trial. Fed. R. Civ. P. Supp. Rule G(2); Complaint, ECF No. 1.

e. Status of Potential Claimants

Virgil Reed Parker, Jr. has entered into a Settlement Agreement with the United States.

No other person or entity has filed a claim and the time to file a claim has passed.

**C. The Civil Requirements for Default Were Met.**

a. The Plaintiff Would be Prejudiced Without a Judgment

1. The government would be prejudiced if it were to try this case rather than obtain a default judgment, since a trial would require the additional expenditure of human and financial resources. These expenses and efforts are unnecessary because the Complaint established sufficient evidence of the status and forfeitability of the property, and that evidence is uncontested by Crystal Marie Whittaker, Demetrius Jose Salinas, and Virgil Reed Parker, Jr. *See United States v. $150,990.00 in U.S. Currency*, No. 2-12-CV-01014-JAD, 2014 WL 6065815, at *2 (D. Nev. Nov. 10, 2014), ("[T]he government would be prejudiced by having to expend additional resources litigating an action that appears to be uncontested. This factor favors default judgment.")

b. & c. The Plaintiff's Claims are Meritorious and the Complaint is Sufficient.

2. As shown in the statement of the case above, the government has a clear case against the property and the Complaint sufficiently alleges the facts of the case.

d. The Amount of Money at Stake

3. The value of the property at stake was clearly established in the Complaint (ECF No. 1), and the property is forfeitable pursuant to 21 U.S.C. § 881(a)(6).

> Under the fourth *Eitel* factor, the court considers the amount of money at stake in relation to the seriousness of Defendants' conduct. Plaintiff has provided evidence that the currency, a sum of $24,000, was furnished or intended to be furnished in exchange for marijuana, a serious violation of federal law.
>
> *United States v. Twenty-Four Thousand Dollars ($24,000) in U.S. Currency*, No. 02:09-CV-2319-LRH, 2010 WL 2695637, at 3 (D. Nev. July 2, 2010) (quotation marks and citation omitted).

The Complaint alleges the serious crime of exchanging or intending to exchange moneys, negotiable instruments, securities, or other things of value for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*. The money at stake is the tainted currency related to a completed or

contemplated illegal-drugs transaction in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*.

e. <u>There Are No Possible Disputes of Material Fact</u>

4. No issues of material fact exist and the allegations of the Complaint are established as a matter of law. The property is subject to forfeiture because law enforcement can demonstrate that the defendant property:

a. is all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

b. is all proceeds traceable to all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. §801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

c. is all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

f. <u>Default Was Not the Result of Excusable Neglect</u>

5. The record shows that the claimants were properly served with the Complaint, Order, Summons and Warrant, and the Notice and failed to file a claim and answer to the Complaint. There is no evidence of excusable neglect.

///

///

g. Public Policy Does not Prevent Default Judgment

6. Under Fed. R. Civ. P. 55(b), default judgments are allowed. Here, the potential claimants did not file claims or answers to the government's Complaint.

> While the Federal Rules do favor decisions on the merits, they also frequently permit termination of cases before the court reaches the merits. As F.R.C.P. 55 indicates, one such instance is when a party fails to defend against an action, which is exactly what [claimants] failed to do in this case. Thus, the preference to decide cases on the merits does not preclude a court from granting default judgment.
>
> *Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996) (brackets added).

Denying the government's motion would not further public policy. While cases should be decided on the merits when possible, the claimant has not contested the facts of the Complaint or the forfeiture of the property, which makes a decision on the merits impractical. Therefore, a final default judgment of forfeiture is appropriate. *See Covenant Care California*, 2018 WL 3429669, at *2.

**IV. Judgment**

Based on the foregoing this Court finds that the United States has shown its entitlement to a Default Judgment of Forfeiture as to Crystal Marie Whittaker, Demetrius Jose Salinas, and all persons or entities who may claim an interest in the defendant property and Final Judgment of Forfeiture as to $92,285 and Virgil Reed Parker, Jr.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Default Judgment of Forfeiture is entered against Crystal Marie Whittaker, Demetrius Jose Salinas, and all persons or entities who may claim an interest in the defendant property in the above-entitled action.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Final Judgment of Forfeiture is entered against the $92,285 and Virgil Reed Parker, Jr.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the defendant property be, and the same is hereby forfeited to the United States of America, and no possessory rights, ownership rights, and no rights, titles, or interests in the property shall exist in any other party.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that, Virgil Reed Parker, Jr. forfeited all possessory rights, ownership rights, and all rights, titles, or interests in the property to the United States.

IT IS HEREBY CERTIFIED, pursuant to 28 U.S.C. § 2465(a)(2), that there was reasonable cause for the seizure or arrest of the defendant property.

Date: 4/17/2020

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*